IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

DARRYL BROWN,                        *

    Plaintiff,                  *

vs.                                  *

CENTRAL OF GEORGIA RAILROAD          *        CASE NO. 4:22-cv-117 (CDL)
COMPANY; NORFOLK SOUTHERN
RAILWAY COMPANY; and NORFOLK         *
SOUTHERN CORPORATION,
                                     *
    Defendants.
                                     *
_____   *

O R D E R

    Darryl Brown worked as an engineer for Central of Georgia
Railroad Company.  Brown contends that Central of Georgia
retaliated against him in violation of the Federal Railroad Safety
Act ("FRSA"), 49 U.S.C. § 20109, by taking disciplinary actions
against him for reporting work-related injuries, reporting
locomotive issues, accurately reporting his hours of service, and
complying with the federal hours-of-service law.

    Defendants filed a motion for summary judgment, asserting
that Brown's FRSA claims fail as a matter of law.  As discussed in
more detail below, that motion (ECF No. 25) is granted in part and
denied in part.  Also pending before the Court is Brown's motion
to amend his initial disclosures and interrogatory responses to
add a newly discovered fact witness (ECF No. 23), which is granted.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Brown, the record reveals the following facts.  Darryl Brown has worked for Central of Georgia Railroad Company since 1998 and has been a locomotive engineer since 2004.  Central of Georgia is a subsidiary of Norfolk Southern Railway Company, which itself is a subsidiary of Norfolk Southern Corporation.

Since approximately June 2019, Brown worked as the locomotive engineer on Central of Georgia's "A45 Job" in Sylacauga, Alabama. During November 2019, when the events giving rise to this action occurred, Brown's direct supervisor was Assistant Trainmaster

Lamont Beard.  The Trainmaster with responsibility for the entire territory was Allen Lockhart, who started in that role a few days before the events at issue.  Brown asserts that he did not know of or speak to Lockhart before November 7, 2019.

The A45 Job serves only one customer: the Eastern Alabama Railway ("EARY").  As the A45 job operated on November 7th, 2019, the crew would pick up rail cars from EARY on its nearby interchange, take them to Norris Yard in Birmingham, Alabama, then pick up other rail cars to return to EARY.  They would then finish their shift at the Sylacauga depot.  As part of the A45 Job, Brown works alongside a conductor.  The A45 conductor in October and November 2019 was Richard Slay.  Brown and Slay came on duty at the Sylacauga depot at 4:00 P.M. but could not enter EARY property before 5:00 P.M. and were supposed to get permission before doing so.  The track between the Sylacauga depot and EARY's interchange is also owned by EARY, meaning the A45 crew could not leave for EARY's interchange before 5:00 P.M.  Even after 5:00 P.M., the crew still needed EARY's permission before they departed.  Kirkland Dep. 17:12-18:3, ECF No. 26-12.

The crew was also required to have certain paperwork in order before departing and make sure that certain billing information showed up in the Remote Information Terminal ("RIT") device.  Ault Dep. 51:4-52:22, ECF No. 26-10 (transcribed here as "writ" device). There was a bulletin stating that no work was to be done if it was

not on the RIT device, and that one should contact their supervisor if he or she encountered RIT or paperwork issues.  Defs.' Mot. Summ. J. Ex. A, "No-Bill, No-Pull" Bulletin 1, ECF No. 25-3 at 154.  It is the conductor's responsibility to gather this paperwork and make sure the RIT device shows the appropriate information. Ault Dep. 53:14-17; *see also* Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. G, Norfolk Southern Operating Rule 610(d), ECF No. 26-15 ("Before starting, Conductors must secure the prescribed documents . . . .").

The A45 crew, including Brown, had to comply with the federal Hours of Service Act for railroad personnel.  49 U.S.C. § 21103. This law mandates that train employees cannot "remain or go on duty for a period in excess of 12 consecutive hours" and that an employee cannot resume working "unless that employee has had at least 10 consecutive hours off duty during the prior 24 hours." *Id.* § 21103(a)(2)-(3).

Brown asserts that if the A45 job went perfectly without any delays, it would take approximately 11 hours to complete.  Brown Decl. ¶ 3, ECF No. 26-4.  Delays are common, however, due in large part to congestion at the crowded Norris Yard that could prevent the A45 crew from departing in time to complete its delivery back to EARY.  Beard Decl. ¶ 6, ECF No. 26-11.  Further delays resulted from the fact that the required paperwork and RIT device work orders were rarely ready when the crew arrived for duty.  *Id.* ¶ 4.

4

As a result, Brown states that the A45 job is usually impossible to complete without violating the hours-of-service law by working more than 12 hours.  Brown Decl. ¶ 4.  Since working a regular assignment as the A45 engineer beginning in June 2019, Brown reported his hours of service and would at times reach the maximum hours allowed, resulting in service delays to EARY.  Such delays, attributed to hours-of-service requirements, occurred as recently as November 2019.  Service delays and their reasons were discussed on a daily conference call between the Defendants' managers working in and around Norris Yard, including Jason Ault, who on November 7, 2019 was Norfolk Southern's Senior Terminal Manager in Birmingham.  Ault Dep. 29:8-31:9.

Beard discussed these congestion issues with Defendants' leadership frequently, including Eric Peters and Jason Ault.  Beard Decl. ¶ 6.  Beard called Peters so frequently to request a relief crew when the A45 crew could not complete its delivery that Peters would sometimes answer Beard's calls with "[l]et me guess, the A45 didn't make it."  *Id.* ¶ 7.  Beard states that "it had been widely discussed and was well known to management that the Hours of Service related delivery problems to EARY were the product of a job design failure" and that "Peters and [Beard] had an ongoing dialogue about the delivery failures to EARY being a job design issue rather than a crew problem."  *Id.* ¶ 10.

On November 7, 2019, Defendants' representatives met with EARY representatives at Norris Yard.  Tom Murphy, along with Ault and Peters, attended the meeting on behalf of Defendants.  EARY was dissatisfied with the frequency of failed deliveries from the A45 crew.  EARY showed Defendants' representatives a spreadsheet that identified hours-of-service issues as the reason for failed deliveries throughout 2019, including for two days already in November 2019.  EARY's understanding was that hours-of-service issues were the primary reason for their inadequate service. Murphy Dep. 31:4-22, 35:21-36:3, ECF No. 25-9.  Jason Kirkland, an EARY representative, said Defendants' representatives identified railway congestion as a cause of the delivery failures at the meeting, and could not recall them offering any other reasons. Kirkland Dep. 31:1-18, ECF No. 26-12.

After the meeting, Ault and Murphy went to the Sylacauga depot to observe the A45 crew shortly before they went on duty.  They did not speak to the crew or enter the depot.  The A45 was not ready to depart until approximately 5:20 P.M.  Ault and Murphy took issue with the length of time it took Brown and Slay to get ready to depart and asked them what they had been doing since coming on duty.

Slay stated he had issues with the required paperwork and had been on calls with Defendants' support staff to work out the issues until approximately 5:20 P.M.  Disciplinary Hr'g Tr. ¶ 421, ECF

No. 26-16.  Brown checked for and reviewed bulletins and gathered supplies for the engine.  Brown Dep. 111:4-112:17, ECF No. 26-3. Brown kept tabs on Slay's progress; when he knew that Slay was within 10-15 minutes of resolving his paperwork issues, he completed the required engine check and had the engines ready to go when Slay came out to the train.  *Id.* at 116:4-18.  Murphy then spoke with Lockhart and Peters over the phone.  Lockhart told them he had previously instructed the crew that if they encountered any paperwork issues, they should call Lockhart.  There is a genuine fact dispute on whether Lockhart ever spoke to Brown because Brown asserts that he never heard of Lockhart or spoke to him before November 7, 2019.

Ault and Murphy removed Slay and Brown from service pending an investigation.  Brown was charged with "conduct unbecoming and failure to follow instructions of Trainmaster Lockhart when you failed to properly and efficiently begin your job duties resulting in intentional and unnecessary delay to Carrier and customer operations."  Defs.' Mot. Summ. J. Ex. A, Letter from J. Ault to D. Brown & R. Slay 1, ECF No. 25-3 at 74 ("Charging Letter").  Ault was the charging officer.  Peters ultimately decided after the hearing on the charges that both Slay and Brown should be dismissed.  Brown was dismissed from his railroad employment through a letter in December of 2019.

Brown brought this action under the FRSA, alleging that his removal from service and discharge were in retaliation for causing service delays by complying with the federal hours-of-service law and other activities that are protected under the FRSA.[1]

DISCUSSION

The FRSA prohibits railroad carriers from discharging, suspending, or discriminating against an employee "if such discrimination is due, in whole or in part, to the employee's" lawful and good faith engagement in a statutorily protected activity. 49 U.S.C. § 20109(a). The FRSA incorporates the burden-shifting framework for retaliation claims established in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century. *Id.* § 20109(d)(2)(A)(i) (stating that actions under FRSA are governed by the rules, procedures, and legal burdens in 49 U.S.C. § 42121(b)). Under that framework, the complaining employee must make a prima facie showing that his protected activity "was a contributing factor" in an "unfavorable personnel action" against the employee. 49 U.S.C. § 42121(b)(2)(B)(i). The complaining employee "need only show that his protected activity

---

[1] In 2007 and 2017, Brown was injured in traffic accidents while being transported for work. Brown filed Federal Employer's Liability Act ("FELA") claims against Norfolk Southern for both injuries in 2008 and 2018, respectively. Brown's final asserted protected activity is reporting locomotive issues, including reporting engine problems on November 1 or 2, 2019 and November 4, 2019. Brown Dep. 66:17-67:22, 72:10-73:12. On the days he reported and addressed these issues, he worked longer than 12 hours. *Id.* at 68:20-21, 82:9-12

'was a contributing factor' in the retaliatory discharge or discrimination, not the sole or even predominant cause." *Majali v. U.S. Dep't of Labor*, 294 F. App'x 562, 566 (11th Cir. 2008) (per curiam) (quoting 49 U.S.C. § 42121(b)(2)(B)(i), (iii)). So, "if a retaliatory motive 'tends to affect in any way the outcome of the decision' to take an adverse action against an employee, the statutory protections apply." *Id.* (first quoting *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.3 (5th Cir. 2008); then quoting *Marano v. Dep't of Just.*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)).

This Court has recognized that the contributing factor standard "is meant to be a more lenient standard than Title VII's 'but for' causation standard in retaliation cases." *Carman v. Cent. of Ga. R.R.*, No. 4:18-cv-203 (CDL), 2020 WL 4574492, at *5 (M.D. Ga. Aug. 7, 2020). If a plaintiff makes this prima facie showing that his protected activity was a contributing factor to an unfavorable personnel decision, the defendant can still prevail if it proves by clear and convincing evidence that it would have taken the same adverse personnel decision absent the protected activity. *Majali*, 294 F. App'x at 566-67.

Brown claims that Central of Georgia suspended and discharged him for engaging in the following protected activities: (1) reporting personal injuries he suffered on the job in 2007 and 2017; (2) filing personal injury claims under the Federal

Employer's Liability Act against Norfolk Southern in 2008 and 2018;
(3) reporting locomotive issues; and (4) complying with the hours-
of-service law, which resulted in service delays.[2]  For purposes
of their motion, Defendants do not dispute that Brown engaged in
protected activities when he reported his injuries, reported
locomotive issues, and complied with the hours-of-service law.
Nor do Defendants dispute that removing Brown from service and
later terminating his employment were unfavorable personnel
actions.  Rather, they contend that Brown cannot establish that
any of his protected activities was a contributing factor for an
unfavorable personnel action.  Thus, the key question for the Court
is whether Brown submitted enough evidence to allow a jury to
conclude that his protected activities contributed to an
unfavorable personnel action.

Close temporal proximity between the statutorily protected
activity and the adverse employment action can be probative of
causation.  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364
(11th. Cir. 2007) (per curiam) (explaining temporal proximity
causation in the more stringent Title VII context).  But close
temporal proximity *alone* must be "very close" to permit a jury to
infer causation, and gaps of three months or more have not been

---

[2] Defendants assert that Brown abandoned his claims that reports of
personal injuries and locomotive problems were contributing factors by
not arguing them.  But Brown did mention these claims briefly in his
response to the motion and statement of material facts.  Accordingly,
the Court does not consider these claims abandoned and will address them.

found to be "very close."  *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

There is no close temporal proximity between Brown's pre-2019 protected activity and the November 2019 suspension and subsequent discharge.  Brown did not point to any other evidence suggesting that his injury reports in 2007 and 2017 or his 2008 and 2018 FELA actions contributed to the unfavorable personnel actions in 2019. Thus, Brown cannot establish an FRSA claim based on this protected activity.

His 2019 protected activity, however, is a different story. Not only is the temporal proximity between these protected activities and his unfavorable personnel action very close (just a few days in some instances), but Brown also points to evidence from which a reasonable jury could doubt the truth of Defendants' offered explanations for that unfavorable personnel action.  This too is probative of discriminatory intent in contexts where employees must meet a higher burden than "contributing factor" causation.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). ("Proof that the defendant's explanation [of their decision] is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination . . . .")

For example, this Court found that when an employer investigated an employee within a week after reporting his injury

and terminated him shortly after that for a social media post that the decisionmaker called an "idle threat," the combination of temporal proximity and an arguably pretextual reason for the termination established a genuine fact dispute on the contributing factor element of the employee's FRSA claim. *Carman*, 2020 WL 4574492, at *5-6; *see also Suber v. CSX Transp. Inc.*, Nos. 4:15-cv-200, 4:15-cv-204 (CDL), 2016 WL 9114008, at *2-3 (M.D. Ga. July 22, 2016) (finding summary judgment was inappropriate when plaintiffs presented evidence of close temporal proximity coupled with circumstantial evidence that the employer's proffered reasons for suspending plaintiffs were false and the true reason was retaliation for protected activity).

Here, Brown presented evidence that the A45 job experienced delays due to his observance of the hours-of-service laws just a few days before he was disciplined. His protected activity includes reporting two locomotive issues within a week of his removal, both of which led him to work over 12 hours. Further, Brown presented evidence that the surveillance of his activities on November 7, 2019 occurred just after Defendants met with EARY and were told that EARY was unhappy with service delays that EARY attributed to hours-of-service concerns. He also presented evidence that the A45 job, as designed at the time, was nearly impossible to complete without running into hours-of-service delays and that management was aware of the issue and aware that

12

it was caused by design issues rather than crew performance. Construing these facts in the light most favorable to Brown, a reasonable jury could conclude that Defendants got a report from an unhappy customer that they were experiencing delays due to hours-of-service issues and, knowing that the job could not be completed without violating the hours-of-service law, they chose to remove Brown that same day for complying with the law and causing these delays.

Brown also presented evidence which a reasonable jury could find contradicts Defendants' stated reason for his removal from service and dismissal. One of Defendants' chief proffered reasons for Brown's discipline is that Brown did not obey Lockhart's instruction to call him in the event of paperwork issues. But Brown stated that he had never spoken to Lockhart and had not received any instruction from him. He also stated that Slay never told him about any instruction from Lockhart to contact him about paperwork issues. Brown Dep. 144:15-19. Ault stated that he had never charged an employee before with failing to follow the instruction of a supervisor with whom the employee never communicated nor for delaying operations if the engine was ready to go when the conductor arrived with the required paperwork. Ault Dep. 72:4-21. Additionally, Brown pointed to evidence that paperwork issues are the sole responsibility of the conductor,

potentially casting doubt on whether he would be required to call Lockhart even if he had heard the instruction.

The other reason given for Brown's discipline is that he delayed the A45 job by failing to crank the engines for inspection until close to the time of departure. But Brown's regular practice was to start the engines, as required for his pre-departure check, within fifteen minutes of leaving. Brown Dep. 135:18-136:1. This practice was based on his understanding of Norfolk Southern's fuel conservation rules that the train should not be started until close to when the conductor was ready to depart.[3] Brown Decl. II ¶ 4, ECF No. 26-19. No supervisor ever criticized him for this practice before November 7, 2019. *Id.* One of these supervisors was Ault, himself. *Id.* ¶ 5. Furthermore Beard, another one of Brown's supervisors, "took no exception to . . . Brown doing this because it was consistent with the instructions [Defendants] told me to give the engineers: Don't start locomotives more than 20 minutes before departure." Beard Decl. ¶ 4. If believed, these facts would allow a reasonable jury to doubt that this was a true reason for Defendants to discipline Brown.

Additionally, while Ault stated that Brown could have delayed the job if an issue was found when he inspected the train, he also

---

[3] "Engine [s]ervice [e]mployees are responsible for . . . economical use of fuel and supplies." Norfolk Southern Operating Rule 620(a). "Locomotive(s) at any location that will not be utilized within 30 minutes must be shut down." Brown Dep. Ex. 3-A, Norfolk Southern Rules for Equipment Operation and Handling L-238(a)(1)(a), ECF No. 25-4 at 74.

admitted that Brown did not actually delay it in this instance. Ault Dep. 65:12-18. There is also evidence that even if Brown had cranked the train engines earlier, the crew could not have left until they did because they did not have permission from EARY and the paperwork issues were not resolved until shortly before they attempted to depart. Brown Dep. 114:20-23. Ault also stated that he never before disciplined an employee for a delay when that employee had the train ready to go when the conductor boarded for departure. Ault Dep. 72:9-21. These facts, if believed, would allow a jury to conclude that a delay in inspecting the train was not the true reason for disciplining Brown.

Ultimately, a jury may find that Defendants disciplined Brown because of his unsatisfactory work performance. But, as discussed above, Brown produced evidence that, when taken as true and considered in the light most favorable to him, would allow a reasonable jury to find that Defendants retaliated against him for complying with the hours-of-service law. Therefore, summary judgment is inappropriate for Brown's FRSA claims based on the protected activities of reporting locomotive issues and complying with the hours-of-service law.

Defendants argue that even if Brown's FRSA claims survive, there is not enough evidence to create a genuine fact dispute on punitive damages. Punitive damages are available for violations of the FRSA that are intentional or done with a reckless or callous

disregard for an employee's rights under the FRSA. *James v. CSX Transp. Inc.*, No. 4:15-cv-204 (CDL), 2017 WL 2471828, at *10-11 (M.D. Ga. Feb. 21, 2017). Brown put forth evidence that his compliance with the hours-of-service law, which Defendants do not dispute is a protected activity, contributed to Defendants' decision to remove him from service. If a jury finds Brown's evidence credible, it could reasonably find that Defendants intentionally violated the FRSA or acted with a callous or reckless disregard of Brown's FRSA rights, since the charging officer knew taking an adverse action in retaliation for an employee's engagement in protected activities was illegal. Ault Dep. 88:8-14. Accordingly, the issue of punitive damages should be decided by a jury and not through summary judgment.

Also pending before the Court is Brown's motion to amend his initial disclosures and interrogatory responses even though discovery is now closed. In general, the applicable rules prevent a party from using a witness who was not properly identified during discovery "unless the failure was substantially justified or is harmless." Fed. R. Civ. Proc. 37(c)(1).

Here, Brown's counsel was contacted by Dennis Farley, who previously worked as a Norfolk Southern dispatcher, on an unrelated matter after the discovery deadline in this action had passed. Counsel learned that he had discoverable information relating to this action. Mr. Farley was never identified before in any

16

discovery materials and was never mentioned in any depositions. Brown was thus unaware of Mr. Farley's existence until after the discovery deadline had passed.  Under these circumstances, Brown's failure to identify Mr. Farley in his disclosures and interrogatory responses is justified.  Additionally, allowing Brown to use this witness will not prejudice Defendants, since they will be given an opportunity to depose Mr. Farley.

CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (ECF No. 25) is granted as to Brown's claim that he was retaliated against for reporting work-related injuries and filing FELA suits based on those injuries.  Defendants' motion (ECF No. 25) is denied as to Brown's claims of retaliation based on reporting locomotive problems and complying with hours-of-service law requirements.  The motion is also denied as to Brown's claim for punitive damages.

Brown's motion to amend his initial disclosures and interrogatory responses (ECF No. 23) is granted.  The Court declines to reopen discovery, but Defendants shall be permitted to take the deposition of Mr. Farley before trial.

The parties are notified that the Court intends to try this action during its March 2024 trial term.

IT IS SO ORDERED, this 7th day of November, 2023.

S/Clay D. Land
_____
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA